Good morning, Your Honors. May it please the Court, my name is Jean Doherty with Jenner and Block, and we've been appointed by the Court as pro bono counsel for the appellant in this case, Mr. William Michael Jones. Your Honors, at this time I'd like to reserve five of my time for rebuttal, and I see I have the clock here, so I'll be sure to keep my eye on it. Okay. Thank you. As the Court is aware, this case was filed in 2000, and it has a long and complicated history in the district court. We raised several arguments on appeal, which we've addressed in our briefs. I'd like to begin with the issue of the district court's dismissal of Portland General Electric in 2002. Your Honor, Portland General Electric should not have been dismissed in this case. In Jones' complaint, he alleged that the defendants, including Portland General Electric, participated in discharging Phil into the waters of the United States without a permit, pursuant to Section 404 of the Clean Water Act. And on March 22, 2002, the district court granted PGE's motion to dismiss, concluding that Jones alleged only a wholly passed violation, and thus that the court lacked subject matter jurisdiction over his claims. On this Court's de novo review, the Court should conclude that the district court erred. First, Your Honors, and most importantly, Mr. Jones did not allege a wholly passed violation under Section 505 of the Clean Water Act. He alleged a continuing violation. Does Portland General Electric have any ownership of this property anymore? No, Your Honor. What can we do about that, then? What can the Court do about it? Your Honor, actually, the district court addressed that issue, and we believe that's one place the district court erred. The court held that because the land was sold to the Port of Portland under threat of condemnation. Quite a while ago, too, wasn't it? Yes, it was, Your Honor. When did they sell it? I believe it was in 1994. Right. May of 94? May 24, 1994. I'm having a hard time getting my mind around how anything that happened back then couldn't be other than wholly in the past. Certainly. Your Honor, actually, the Ninth Circuit addressed that issue in San Francisco Baykeeper v. Tosco, and the district court didn't have the benefit of Tosco when it issued its ruling. But in Tosco, an environmental group brought action under the Clean Water Act against owners of a petroleum coke facility, and they alleged illegal discharges in connection with the storage of the petroleum coke. The allegation was basically that they were storing coke in uncovered piles and it was blowing off into the wind. And Tosco said, because of the important deterrent function of penalties under the Clean Water Act, a defendant cannot escape liability arising out of past violations by selling a polluting facility that continues to operate. And in Tosco, that's exactly what had happened. The facility had changed ownership, and the court held that that was not a reason to find a holding facility. Who brought the action in Tosco? It was an environmental group, Your Honor. So the district court, when it made its ruling, as I said, it didn't have the benefit of Tosco. It relied on two other cases, Dutra and Brosman Sales, which the appellees did not cite in their briefs in this case. And I think that's probably because it's at this point well settled that that's no longer the law of the Ninth Circuit in light of Tosco. And I'll also note, Your Honor, there's... So Tosco is your best case? That's right, Your Honor. You're not really, really relying on Sasser anymore? Well, we are relying on Sasser for the... Because Sasser was brought by the EPA, wasn't it? It was, Your Honor. And we are relying on Sasser for the continuing violation doctrine in general, which is something that I'd also like to talk to the court about because I think the district court didn't expressly address the continuing violation doctrine. It sort of said, well, the land is sold. There's no violation. We're done here. And the district court was... Well, my worry was with Sasser, and the reason I was making sure you're not really going on that and Tosco's your best is because I thought when we're talking about the EPA bringing the suit, it's totally different than when an individual brings the suit. And I can't find anything to suggest that the individual just snaps into the shoes of the government. Well, Your Honor, we are relying on Tosco instead of Sasser, but... So if I don't find Tosco persuasive, what's your best argument? Well, in light of Tosco, I think we would say that's the law now, Your Honor, and that is the only case that we found in the Ninth Circuit that... Are there any facts in the record that PG&E will repurchase the land ever again? No, Your Honor. There are no facts in the record suggesting that. But, again, this was dismissed at the pleading stage, and all the allegations must be taken as true. And Mr. Jones... I don't believe so, Your Honor. I'm sure the appellees who have been with the case a little longer than me would know that, but I don't believe so. So if you're correct, what is Portland General Electric's exposure here? What could they be ordered to do? Well, what Mr. Jones sought was mitigation and removal of the fill, and there's precedent for the proposition that when there's been a violation, an injunctive relief is the remedy the district court, within its inherent authority, to craft pretty much any remedy it sees fit. It can't actually order the polluter to go back in and fix what happened. Well, they got the next group got an after-the-fact permit, didn't they, to justify the fill? That's right, Your Honor. And what do we do about that fact? Well, the after-the-fact permit is a slightly different issue from the after-the-fact permit with respect to PGE. Well, is there a different fill involved? I believe so, Your Honor. Okay. Well, what does the after-the-fact permit cover? So the after-the-fact permit, Your Honor, was issued in 2005, and it basically it prospectively, under our argument, it prospectively authorized fill of 1.19 acres on West Hayden Island. Well, it authorizes after-the-fact as a retroactive permit, right? Well, Your Honor, we actually would argue that it is not. We would argue that under Regulation 326.3E4, citizen suits should be included within that regulation. Should be but aren't? Is that your argument? Well, not under the plain language of the regulation. They're not, Your Honor. Yeah, well, that's somewhat similar to what I thought the problem was with Sasser. Sasser dealt with the EPA doing stuff, and now we've got an after-the-fact permit that we're suggesting that the plain language of the regulation should be us, even though it isn't us, so therefore, it ought to be construed in favor of us. Well, I want to make sure, and I want to make sure I'm understanding your concern, Judge Smith, but with respect to PGE, I don't believe there is an after-the-fact permit that ever came into play there. All right. And that's why it's so important that we, that this Court adopts the continuing violation doctrine here, because Mr. Jones alleged Phil in a wetland that was not removed, and there was no mitigation that took place with respect to that. And the overwhelming weight of authority, Your Honors, which the appellees disagree with, but which we believe is clear, says that when there's been allegations of Phil in a wetland, this is consistent with Section 505 and with the Supreme Court's decision in Gwaltney, that Phil is a continuing violation. And until it's removed, there is room for, and subject matter jurisdiction for, a citizen's suit. So if we turn, then, to the Port and to the Corps, and we're talking about the after-the-fact permit, it's your argument in that particular instance that you ought to be substituted for the Federal, State, or local regulatory agencies? Well, not substituted, Your Honor, but that, yes, Mr. Jones, as a citizen who does stand in the shoes of the EPA in some key ways, should be treated the same as the regulatory agencies. You're down to almost five minutes, and you wanted to reserve some time, Ms. Jorde. Yes, I would like to. Thank you, Your Honor. Thank you. I wonder if the appellees have figured out how they're going to divide up their 15 minutes. Okay. Let's start with how that's going to happen. Sure. First of all, Alan Brabender with the U.S. Department of Justice here on behalf of the Army Corps and the Federal Defendants. Out of the 15 minutes allocated to the appellees, I will use the first eight minutes or so to address the Clean Water Act jurisdictional issue. Okay. Then I will yield to Mr. Lepo, who will address the act-of-the-fact permit. Mr. Arneson, who was representing Portland General Electric, had a close friend pass yesterday and is not here to represent Portland General Electric. I see. Mr. Furl is here from his law firm, but is not prepared to give argument today. All right. So, Mr. You'll be using eight minutes. Mr. Lepo, seven minutes, I take it. That's correct. Okay. Thank you. Estella, would you please put eight minutes on the clock? Hang on a second. We're getting the clock organized. Yeah. First of all, regarding the Clean Water Act jurisdictional issue, the Corps reasonably determined that its jurisdiction under the Clean Water Act at West 18 feet NGVD, that's National Geodetic Vertical Datum. And why is the jurisdictional determination important? It's important because Congress enacted the Clean Water Act pursuant to its authority to regulate interstate commerce. And pursuant to the Commerce Clause, Congress has the ability to regulate and protect navigable bodies of water because those are important conduits for both interstate and foreign commerce. So the Clean Water Act, among many other things, prohibits the discharge of dredge and fill materials into a navigable water body unless you have a permit from the Army Corps. But the Act doesn't define a navigable water and it doesn't state how far landward the Clean Water Act in the Corps' jurisdiction extends. And to assess its landward jurisdiction in the absence of actual data showing the reach of that navigable water, which may exist for some tidal water bodies, the Corps' regulations tell the Corps to put the boots on the ground and to go out and physically inspect the shoreline to determine the reach of the navigable water based on the physical characteristics that exist on the shoreline. Here, the Corps didn't have any actual data on the reach of the Columbia River at West Haden Island. So the Corps did what its regulations tell it to do. It put the boots on the ground. It made a number of field visits to the area. It conducted site surveys and it reviewed the historic river gauge data. And from this, it was able to identify a line marking the extent of its jurisdiction at West Haden Island. And that line is at 15 feet NGVD. Now, oddly, when arguing the Corps has more jurisdiction over the island than the Corps believes, Jones does not challenge this 15-foot determination. He focuses on the label the Corps applies to it, which is the ordinary high water mark. He, as this Court knows, believes it should be called the high tideline because he believes the waters at and surrounding West Haden Island are tidal. But the label the Corps applies is irrelevant because the Corps went out and physically inspected the island and determined based on its physical characteristics that the jurisdictional reach of that water body ends at 15 feet NGVD. It doesn't matter what this 15-foot point is called. It could be called the high tideline. It could be called the ordinary high water mark. It could be called something else entirely. The point is it's at 15 feet. Now, what makes Jones' argument here so frustrating is that in district court, he admitted it made no difference what the jurisdictional mark is called. I would refer this Court to pages 8 and 9 of our supplemental excerpts of record and pages 112 to 114 of Jones' supplemental excerpts of record. That's the same document. And in that document, Jones is making the same argument I am making here, which is it doesn't matter what you call the jurisdictional mark. You could call it the high tideline. You could call it the ordinary high water mark. It's a distinction without a difference because jurisdiction is assessed based on physical characteristics. And what makes it even more frustrating is Jones made the correct argument in his district court filing. He then went on to argue that the marks lie at 22 feet based on the physical characteristics of the island. That's the argument he should be making here. He should be making the argument that the Corps' determination of 15 feet is arbitrary because the evidence in the record shows it's 22 feet. Now, don't get me wrong. We would be able to defeat that argument. The record clearly shows it's at 15 feet. But that's the argument Jones should have made. What's the impact for this case? I'm sorry, Your Honor. Well, you're telling me the argument he should have made. What's the impact on this case? Well, I understand it to be that it's a question of whether you can get to an additional complaint that he's offered up with regard to a forgotten number of acres. Is that the practical impact? Well, the practical impact is the argument he's making is entirely irrelevant. Fine. But you're presumably starting with this because it has some impact on the defense you're offering. And I'm trying to figure out what's the practical impact on this case of saying that the 15-foot mark is not contested. Well, the 15-foot mark, so it involves that 20 acres. Because the 20 acres that because of that you say is out of the case because it's not properly within the Corps' jurisdiction. It's not within the Corps' jurisdiction. Right. That's correct. And I guess I'm wondering, I mean, you're really going at this a little bit differently than I thought it would only because the only way I can overturn this decision, if it's arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law, correct? That's correct. So it seems to me that I really don't have to side with you or with him necessarily because all I need to find is if the court was arbitrary or you were arbitrary or you were capricious or you did something outside the law, correct? That's correct, Your Honor. I just wanted the court to understand that it really makes no difference whether or not the waters at West Hayden Island are title. But the record does support the determination that the waters are non-title. Now, the Corps agrees that the effects of the tide can be seen at West Hayden Island during the low-water months. But those effects are masked by reservoir releases and upstream dam flows during the high-water months. And the high-water months are the most important for the jurisdictional analysis because jurisdiction is based on a mark of high water. The water levels at West Hayden Island during the high-water months are a result of rainfall, snowmelt, reservoir releases, not astronomical tides. And, of course, the water levels are going to vary considerably during this time because rainfall varies considerably. And, therefore, the water surface at West Hayden Island does not rise and fall in a predictable rhythm. What are the effects of the after-the-fact permit? The after-the-fact permit rendered the port's previously unauthorized fill entirely lawful and in compliance with the Act. All of them, all of the fills? Well, there was only 1.2 acres of fill at issue, Your Honor, and yes. Okay. With that, Your Honor, I will yield the remainder of my time to Mr. Lepo to address the after-the-fact permit issue. Thank you very much. Mr. Lepo. Good morning. Your Honor, my name is Jeff Lepo. I represent the Port of Portland. Okay. Planning to address the after-the-fact permit. Do you want to reset the clock or should I just? You've got eight minutes left, so. Thank you, Your Honor. Also, I'm the only counsel here today who was involved in the case below, and so if the Court has any questions about facts pertaining to what happened below on any of the issues, I'd be happy to answer them. I'm probably in the best position of anyone here today to answer those. With respect to the after-the-fact permit, the established facts are as follows. Extreme flooding along the Columbia River in the winter of 1996 required emergency dredging, according to the Corps. When the Corps turned to the Port, the Port designated an upland area at West Hayden Island, which it determined would avoid wetlands using a wetland evaluation that it had provided to the Corps in 1995. In June of 1998, two and a half years before Mr. Jones brought this lawsuit, the Port voluntarily self-reported that six isolated areas of wetlands amounting to slightly more than an acre had mistakenly been covered in dredged material. The Corps investigated, and it expressly determined in writing that the Port's filling was based upon the best available information at the time and was entirely unintentional. The Corps also expressly determined in writing that it would not pursue an enforcement action given these facts, and it directed the Port to apply for an after-the-fact permit. Instead, the Port applied for an after-the-fact permit. The process was delayed while the district court resolved jurisdictional Clean Water Act boundaries. Then the Corps issued the permit. Mr. Jones amended his complaint to challenge the after-the-fact permit, and the Court sustained it. The first contention that's made here about the after-the-fact permit is the Corps was barred by law from issuing the Port an after-the-fact permit because of Mr. Jones' citizen suit. The problem with this argument is exactly the point that Judge Smith pointed out earlier, which is the Corps has a specific regulation. The regulation says that after-the-fact permits shall be processed unless one of four exceptions apply, and we all agree that none of those exceptions apply here. Moreover, the issuance of the after-the-fact permit is consistent with the interpretation of the Corps' own regulations by the Corps, which is entitled to great deference. In this circumstance, in replacement briefing, the argument has been forwarded that as a matter of policy, this Court should create a prohibition on after-the-fact permits being issued while a citizen suit is pending. Now, the defects with that are considerable. Mr. Jones never made this contention below to begin with. Second, policy considerations cannot override the plain language of the regulation, nor can it override the Corps' reasonable interpretation of its own regulation. Third, the policies espoused here do not reflect the intent of Congress in the Clean Water Act or in the Corps' regulation. And fourth, even if these policies were relevant, applied here they would not encourage deterrence. And here's why. The Port took action because of a public emergency, not for private gain. It used the best available information. Its mistake was, by all accounts, inadvertent. The mistake was self-reported, and here there's been no enforcement by the agencies as an intentional and fully informed exercise of agency discretion for well-warranted reasons. The second contention made here is that even if the Corps lawfully issued the Port and after-the-fact permit, the permit does not serve to bring pre-existing fill into compliance with the Clean Water Act. Again, there are numerous problems, and I'm just going to mention two. First, again, in eight years of district court litigation and four years of appellate practice, the only time this argument has surfaced is in the replacement briefing in this Court. I can't emphasize enough that Mr. Jones is a sophisticated litigant. He has filed and maintained three federal lawsuits, three federal appeals, and has been in continuous federal litigation for a dozen years. He is not an incarcerated pro se plaintiff. He's not an indigent. He's not a special needs plaintiff. Mr. Jones is a self-selected, highly experienced litigant who prefers to represent himself. He was taken seriously below. He was accorded great leeway. The district court protected his rights, and over the course of eight years of litigation, his arguments were fully and faithfully considered. There's no evidence he was outlawed. If anything, it's the other way around, given the length of this case. There's no principle of law or equity or justice that warrants allowing new arguments on appeal 12 years into a case, and I respectfully would say that it would be grossly unfair to do so here. On the merits themselves, I'd direct the Court's attention to the Clean Water Act, Section 404P, and in particular to page 41 and the subsequent pages of the federal appellee's replacement brief. Section 404P of the Clean Water Act provides that any fill authorized by a 404 permit, quote, shall be deemed compliant, end quote, for purposes of the citizen suit provisions of the Clean Water Act. And that's 1311, right? 1344P, and it makes it in compliance with 1311. Deemed in compliance with 1311 for citizen suit. That's correct, Your Honor. That is correct. The interpretation of the United States of Section 44P is entitled to at least skid more deference. The United States interpretation is the only interpretation that gives meaning and effect to Section 404P in the context of an after-the-fact permit. And by contrast, the argument pursued on behalf of Mr. Jones can in no way be squared with Section 404P. That's all I intended to say about the after-the-fact permit. I'd like to say a few things about some questions that came up concerning the PGE argument, given that Mr. Aronson isn't here. And they're mostly about the facts. What do you make of the Tosco decision, as you already mentioned? And that's exactly where I was headed. Okay. In that case, what occurred was that the defendant sold the facility out from under the enforcement action. There was an operating facility. The lawsuit had already been filed. And at that point, the defendant sold the facility and argued that they had escaped liability. In our case, the land was not an operating facility. It was sold six years before the lawsuit was filed, not after the lawsuit was filed. It was sold by PGE under threat of condemnation by the court. So this wasn't a wholly voluntary transaction. The court was going to condemn the land and take it, and so they entered into a transaction in which they agreed upon the price. So there's no – this is in no way a situation in which anyone was acting for reasons that had anything to do with the fill or with that lawsuit. There was no thought of a lawsuit at the time. So it's very different circumstances than Tosco. It's also not an operating facility. The question came up by Your Honor several times about the relationship between the after-the-fact permit and other filling, and so let me just clarify that. The after-the-fact filling has to do with an action that the court took, and it relates only to an acre of land. It has nothing to do with all the other filling that is alleged to have occurred or might have occurred or did occur at West Hayden Island. We don't have, or this court doesn't have, before it facts about whether PGE actually engaged in any filling or not. PGE had a – didn't need an after-the-fact permit. It had a permit. The question and the information that's not before you is whether it actually engaged in any filling under that permit, and if so, did it exceed that. But it doesn't – that issue does not relate to the after-the-fact permit. Okay, got it. Thank you. I see you're – looks like you're out of time. My time's up. Yeah. Thank you, Mr. Lippo. Ms. Doherty, back to you. We've got about five minutes of change left. Could you just talk into the mic, please? Get my affairs in order here. It's not that bad. I just want to address a couple points. First, one thing I wanted to make clear in light of Judge Smith's concerns over Sasser, it was an EPA enforcement case, but the law is very clear that this continuing violations doctrine applies to citizen suits as well. And so there's some – Where do you find that law? Well, Your Honor, in our briefs, and I'll – I mean, I've looked for a case to try to help you, frankly. I didn't know necessarily it was going to be you, but I put you, Mr. Klein, and I couldn't find such a case. The best I could find was Sasser, and then I saw what Sasser was about, and then I looked around for more stuff, and frankly, I couldn't find it. Even U.S. v. Reeves relies on Sasser. That's right. That's right, Your Honor. There are several citizen suits, though, which held the continuing violations doctrine applies here. And one is in – The Clean Water Act action? Yes. Yes, Your Honor. Okay. Maybe you could cite one. Sure. Informed Citizens United, and that's at 36 F. Sup. 2D. 375. And that's actually on very similar facts, Your Honor. The court rejected the argument raised by the appellees. And in fact, the reason that informed citizens is so important, Your Honor, is because it actually explains why Gwaltney does not compel this result that the appellees would urge here. The court actually said the defendant's reliance on Gwaltney for its construction of Section 1365 is misplaced because Gwaltney involved a wastewater violation and thus a much different situation than in the instant action. The court continued to say that several courts in cases involving filled wetlands, which is what we have here, have found Gwaltney inapplicable and held that a violation is continuing for purposes of the statute until illegally dumped fill material has been removed, whether that's yesterday or 10 years ago, Your Honors. And this makes sense given the nature of the violation here. And the appellees suggest in their briefs that, you know, there's no distinction to be drawn between fill in a wetland and other types of affluent discharges. But that's not what's borne out by the cases. For example, in City of Mountain Park, which we cited in our brief, the court said the primary factor that influenced the court to adopt this approach, and that's another citizen suit, was the nature of the alleged pollution in the case. But if I review the Act, don't I find that the language in the Act suggests that jurisdiction is determined by the character of the pollutant, or do I? Well, Your Honor, I don't think that's always true. Well, in fact, I would suggest, I was trying to see where you'd go, I would suggest the language doesn't suggest that it's determined by the character, but important instead is the discharge of the pollutant. Wouldn't you agree with me? Well, Your Honor, I think it's true that the discharge is the key. That's the important part of the language of the Act. Wouldn't you agree? Well, without the discharge, there can be no violations, certainly. And it seems to me, then, we're really talking about discharge of pollutant at the time the suit is brought. So if I look at discharge of pollutant, there has been no discharge here. Everything that's happened is before now. There's no any additional pollutant, if this is really pollutant. There's been no additional discharge, if this is pollutant. And so we don't look at the character, but we look at what happens if we're going under the Clean Water Act. All right. Well, Your Honor ---- If you might explain how that's wrong. I mean, I look for ---- Sure. Even if I find a case to help you, that was the big problem I had. I understand, Judge Smith. I understand your concern. I don't agree with it. I think that under 33 U.S.C. Section 1365a, it says that any citizen may commence a civil action on his own behalf against any person who is alleged to be in violation. And these courts and cases that we've cited here say that when you have fill in a wetland, the polluter is, in fact, in violation until the fill is removed. So I would agree with you that you do look at when the suit is filed. But here, when the suit was filed, the violation was continuing under these cases. And that's where the distinction comes in about what type of pollutant it is. What do I do with the language in the Act that talks about discharge? There's been no discharge since you filed your action. What do I do with that language? Well, it's true that there was no discharge, as far as we know, since the suit was filed. But in light of the weight of authority, that doesn't matter. And it talks about any additional pollutant. Right. And that is probably true for most circumstances. And, in fact, as the Court said in Woodbury, probably adopting this exact doctrine that you're raising and in keeping with this concern that you're raising, citizen suits for past discharges, which are not susceptible to remedial efforts due to effective natural dissipation or dispersion, would clearly continue to be barred under Gwaltney. But here, where there's fill-in-a-wetland, that simply doesn't apply, Your Honors. Thank you. And I see that my time has expired. It is indeed. Thank you. Thank you very much. Thank you, attorney. Thank you, counsel. The case just argued is submitted. On behalf of the panel, we want to thank you, Ms. Doherty, and your firm for accepting this pro bono case. Honored to do so. Thank you. The case has been submitted. Thank you, Your Honor.  Thank you. Thank you. Thank you. Thank you. 10-35387. Is it pronounced Shea versus Oregon Department of Transportation? Am I pronouncing that properly? Each side will have 15 minutes.
judges: Silverman, Clifton, Smith